**UNITED STATES of America**

**v.**

**Soliman S. BIHEIRI**

**No. CRIM.A. 03–365–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

Jan. 21, 2004.

---

Gordon D. Kromberg, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

James Clyde Clark, Land, Clark, Carroll & Mendelson PC, Alexandria, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Defendant Soliman S. Biheiri was convicted by a jury on October 9, 2003 on two counts of an indictment charging him with (1) procuring his own naturalization contrary to law in violation of 18 U.S.C. § 1425(a), and (2) swearing to certain false statements made in his Application for Naturalization on August 21, 2000 in violation of 18 U.S.C. § 1015(a). The government at sentencing seeks a number of guidelines enhancements, all of which are sharply disputed by defendant and thus the subject of this memorandum opinion.

### I.

Defendant, a naturalized United States citizen of Egyptian origin, was tried on two counts of a three-count indictment.[1]

---

1. The government's motion to dismiss Count 2 of the indictment alleging a violation of 18

Count 1 of the indictment alleged a violation of 18 U.S.C. § 1425(a) for defendant's procurement of his own naturalization contrary to law by making certain false statements in an Application for Naturalization (Form N–400) submitted on March 15, 1999 and sworn to by defendant on August 21, 2000. Specifically, the government alleged and proved at trial that defendant made the following two false statements on his Application for Naturalization: (1) At Part 3 of his Application, under the heading "Absences from the U.S.," defendant stated that he had been absent from the United States only once in the five years preceding his Application, when in fact he had been absent sixteen times during the preceding five years; and (2) at Part 7 of his Application, defendant stated he had not knowingly committed a crime for which he had not been arrested, when in fact he (i) knowingly made certain false statements concerning his prospective employer and work experience in an Application for Alien Employment Certification on August 8, 1991, (ii) knowingly used a false writing containing materially false statements regarding his prospective employer and the position being offered to him in support of his Second Preference Petition (Form I–140) on April 2, 1993, and (iii) knowingly submitted his materially false Application for Alien Employment Certification and Second Preference Petition in support of his Application for Immigrant Visa and Alien Registration to the American Embassy in Bern, Switzerland on December 21, 1993, all of which acts were violations of 18 U.S.C. §§ 1001(a) and 1015(a) for which he had not been arrested. Count 3 of the indictment alleged, and the government proved at trial, a violation

of 18 U.S.C. § 1015(a) for defendant's swearing to the false statements made in his Application for Naturalization on August 21, 2000 before an Immigration and Naturalization Service ("INS") district adjudications officer. A jury found defendant guilty on both counts.

The matter is now at the sentencing stage. A statutorily-mandated consequence of the § 1425(a) conviction has already been imposed and carried out: Defendant has been required to surrender his American citizenship certificate, which has been received and cancelled; he is no longer an American citizen. *See United States v. Biheiri,* Criminal No. 03–365–A (Dec. 18, 2003) (Order of Denaturalization).

The remaining aspects of defendant's sentence must now be determined. In this respect, the government, relying chiefly on § 3A1.4 of the sentencing guidelines, seeks, by various theories, to enhance defendant's guidelines range on the basis of his business dealings with certain terrorist individuals and organizations. Citing these same dealings, the government also seeks, alternatively, an upward departure pursuant to U.S.S.G. § 5K2.0. Because the departure and enhancements sought are so substantial, the record facts adduced by the parties regarding defendant's offenses of conviction and his dealings with terrorists and terrorist organizations are recited here at some length.

## II.

### A. Facts Underlying Defendant's Convictions [2]

Born in Egypt and educated in Switzerland, defendant first entered the United

U.S.C. § 1001(a)(2) was granted prior to the submission of the case to the jury.

**2.** The facts recited here are derived from the trial record and, in light of the jury's verdict,

they are appropriately stated in the light most favorable to the government. *Cf. United States v. Bolden,* 325 F.3d 471 (4th Cir.2003) (when considering sufficiency of evidence to

States on January 25, 1985 on a tourist visa. This visa status allowed defendant to remain in the United States for six months, during which period he was prohibited from working here. He subsequently obtained an H1–B visa, which permits aliens to work in this country provided they fill certain specialty occupations. In order to receive an H1–B visa, an alien must be sponsored by an employer in the United States. An H1–B visa allows an alien to work in the United States for up to six years. Importantly, receipt of such a visa is conditioned on the requirement that the sponsored alien employee work only for the sponsoring employer. Defendant's sponsoring employer for his H1–B visa was Cambridge Computers and Instruments, Inc. ("CCI"), a company located in Cambridge, Massachusetts. Yet, defendant never actually worked for CCI; instead, he lived in New Jersey and operated BMI, Inc., an Islamic investment firm he incorporated in New Jersey in 1986. Indeed, the record reflects that defendant served as BMI's President from its inception until its bankruptcy in the late 1990s. In this capacity, defendant used BMI as a holding company for various operating entities, including BMI Leasing, Inc., BMI Real Estate Development, Inc. ("BMI REDI"), and BMI Trade and Investment, Inc. Defendant also conducted business through a series of limited partnerships, primarily BMI REDI, investing in projects to develop housing projects in Maryland, including Barnaby Knolls, Meridian Village, Combs Garden, and LaDova Heights.

On August 8, 1991, the Department of Labor received defendant's Application for Alien Employment Certification. In Part A, this application falsely stated that BMI was making an offer of employment to defendant for the position of Vice Presi-

dent subject to supervision by BMI's president. Hussein Ibrahim signed this form as BMI's President, and falsely swore to it under penalty of perjury. Defendant completed Part B of this form, falsely identifying BMI as his "prospective employer" when, in fact, he had been BMI's President for several years. He also falsely stated in Part B of the form that vice president of BMI was the "occupation in which alien is seeking work," when, in fact, defendant was already the President and Hussein Ibrahim was the Vice–President. Moreover, defendant falsely identified his work experience by stating that he worked for CCI on a full-time basis between August 1985 and May 1990.

Defendant's labor certification request was approved by the Department of Labor on January 29, 1993. Thereafter, on April 2, 1993, Hussein Ibrahim submitted to the INS an Immigrant Petition for Alien Worker, supported by the false labor certification. Like the labor certification request, this form falsely described defendant's proposed employment as Vice President of BMI and it, too, was signed under penalty of perjury by Hussein Ibrahim. Attached to this Immigrant Petition was a letter dated March 9, 1993, signed by Hussein Ibrahim as President of BMI, falsely stating that BMI wished to employ defendant, falsely describing defendant's work experience at CCI, and adding a fabricated description of the duties of the position defendant was to fill. On April 8, 1993, the INS approved this Immigrant Petition for Alien Worker.

The approved Immigrant Petition for Alien Worker was then forwarded to the United States Embassy in Bern, Switzerland and relied upon by the Department of State when it issued his immigrant visa. To obtain this visa, defendant on Decem-

sustain conviction, facts are viewed in the light most favorable to the government).

ber 21, 1993 completed an Application for Immigrant Visa and Alien Registration, the contents of which he swore to before a consular officer in Switzerland. Defendant also submitted the Immigrant Petition for Alien Worker and another letter which supported the bogus BMI offer of employment. This letter, dated December 9, 1993, falsely stated that defendant would be employed by BMI as a vice president upon entering the United States. This letter was again signed by Hussein Ibrahim as Chairman of BMI and was notarized by Gamal Ahmed, an employee of BMI. The Department of State approved defendant's application on December 21, 1993 and defendant, visa in hand, returned to the United States as a permanent resident alien on December 23, 1993.

Precisely five years later, defendant on December 23, 1998 executed an Application for Naturalization (Form N-400), which he sent to the INS on March 15, 1999. As noted earlier, the application contained false statements in two sections. Under the heading "Absences from the U.S.," defendant initially answered "no" to the question "[h]ave you been absent from the U.S. since becoming a permanent resident?" and then left blank a table on the form for listing absences from the United States. Subsequently, the Naturalization Examiner reviewed the Application with defendant at his naturalization interview on August 21, 2000. In the course of this review, defendant changed his answer regarding absences from the United States by listing a single visit to Egypt from January 1, 1999 through January 16, 1999. This trip occurred after defendant had executed the Application, but before he had submitted it to the INS. In any event, defendant's statement that he had been absent from the United States only once since becoming a permanent resident was false. In fact, convincing evidence presented at trial showed that defendant had been absent from the United States sixteen times in the five years preceding his Application for Naturalization.

In addition, at Part 7 of the Application, Question 15a asks the applicant, "Have you ever knowingly committed any crime for which you have not been arrested?" Defendant answered this question in the negative, despite knowing that in the past he had provided, and caused to be provided, false information to the INS, the Department of Labor, and the Department of State, all for the purpose of gaining permanent resident status in the United States. The crimes that defendant committed and then concealed from the INS on his Application for Naturalization were all related to his Labor Certification fraud. In preparing, and causing to be prepared, the false Application for Alien Labor Certification, defendant violated 18 U.S.C. § 1001(a)(2)[3] by falsely stating he had an offer of employment to become BMI's Vice President. Nor is there any doubt that defendant knowingly submitted this false application because, as founder and President of BMI, he obviously knew that he was not in fact being offered the position of Vice President. Moreover, stated on the face of the Application for Alien Labor Certification form was the following clear notice:

> To knowingly furnish any false information in the preparation of this form and any supplement thereto, or to aid, abet, or counsel another to do so, is a felony punishable by $10,000 fine or 5 years in

---

**3.** 18 U.S.C. § 1001(a)(2) provides that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully ... makes any materially false, fictitious, or fraudulent statement ... shall be fined under this title or imprisoned not more than 5 years, or both."

the penitentiary, or both (18 U.S.C. 1001).

Defendant also violated 18 U.S.C. § 1001(a)(3),[4] *inter alia,* by using letters signed by Hussein Ibrahim regarding a fictitious offer of employment from BMI in connection with his Immigrant Petition for Alien Worker and his Application for Immigrant Visa and Alien Registration. These letters contained statements defendant knew to be materially false. Furthermore, defendant knew his conduct was a crime. In this respect, the Application for Immigrant Visa and Alien Registration form defendant submitted to the United States Embassy in Bern, Switzerland on August 9, 1993, contained the following clear warning:

> Any false statement or concealment of a material fact may result in your permanent exclusion from the United States. Even though you are admitted to the United States, a fraudulent entry could be grounds for your prosecution and/or deportation.

In addition, when defendant swore to his Application for Immigrant Visa and Alien Registration on December 21, 1993, the jurat clause above his signature on the Application read:

> I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may subject me to permanent exclusion from the United States and, if I am admitted to the United States, may

subject me to prosecution and/or deportation.

In sum, the record plainly reflects, and the jury found, that defendant violated 18 U.S.C. §§ 1425(a) and 1015(a) by swearing to the false statements in his Application for Naturalization and thus fraudulently procured his naturalization.

## B. Evidence Pertaining to Terrorism–Related Sentence Enhancements [5]

### 1. Background

The centerpiece of the government's case for enhancement of defendant's sentencing guidelines is evidence it has meticulously gathered and presented concerning defendant's dealings and contacts with various alleged terrorists and terrorist organizations. These individuals and organizations merit a brief introduction.

The Islamic Resistance Movement, known as HAMAS, was formed in late 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood. HAMAS has used both political and violent means, including terrorism, to pursue its goal of eliminating Israel and establishing an Islamic Palestinian State in Israel, the West Bank, and Gaza. HAMAS is a loosely structured organization, with some elements working clandestinely and others working openly through mosques and social service institutions to recruit members, raise money, organize activities, and distribute materials. HAMAS activists, especially those in its military wing, have conducted, and taken credit for, many at-

---

**4.** 18 U.S.C. § 1001(a)(3) provides that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully ... makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry ... shall be fined under this title or imprisoned not more than 5 years, or both."

**5.** The facts recited here are derived chiefly from the government's investigation summarized in a declaration prepared by David Kane, a Senior Special Agent with the Bureau of Immigration and Customs Enforcement, with relevant documents attached thereto. Also included is information derived from the parties' sentencing pleadings and attached documents.

tacks against Israeli civilian and military targets, including suicide bombings.

The State Department formally labeled HAMAS's activities as terrorism in 1991. In 1992, the State Department listed HAMAS in the Appendix to its Patterns of Global Terrorism Report as an organization that uses terrorism. Each year thereafter the State Department has consistently listed HAMAS as a terrorist organization. And, since January 25, 1995, HAMAS has also been listed as a Specially Designated Terrorist ("SDT") pursuant to the International Emergency Economic Powers Act [6] ("IEEPA").[7] Important consequences flow from these SDT designations. Pertinent here is that dealing in

property in which an SDT has an interest or making any contributions of goods or services to an SDT can constitute a federal felony. *See* 50 U.S.C. § 1705(b) (willful violation of IEEPA is a felony punishable by a fine of not more than $50,000 and/or up to 10 years imprisonment); 31 C.F.R. §§ 595.201(a),[8] 595.204.[9] In addition, any person, including a financial institution, holding property of an SDT person after the date of designation is required to notify OFAC that it holds such property. *See* 31 C.F.R. § 501.603(a).[10]

Closely related to HAMAS is Mousa Abu Marzook. As the HAMAS website reflects, he is one of HAMAS's political leaders;[11] Marzook was elected Chairman

**6.** 50 U.S.C. § 1701 *et seq.*

**7.** Under the provisions of the IEEPA, the President of the United States may take steps to deal with any "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States, if the President declares a national emergency with respect to such threat." *See* 50 U.S.C. § 1701(a). Pursuant to this authority, President Clinton issued Executive Order ("EO") 12947 on January 23, 1995, declaring a national emergency with respect to the "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process [and] constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order 12947, 60 Fed.Reg. 5079 (Jan. 25, 1995). The Annex to EO 12947 lists the Islamic Resistance Movement, or HAMAS, as a terrorist organization threatening to disrupt the Middle East peace process. *Id.* at *5081. Persons and organizations designated as terrorists pursuant to an executive order are known as SDTs, although this term is not explicitly set out in the relevant executive orders. The term Specially Designated Global Terrorist ("SDGT") is also sometimes used. Here, the term SDT is used throughout this opinion.

**8.** 31 C.F.R. § 595.201(a) states:
Except as authorized by regulations, orders, directives, rulings, instructions, licenses, or

otherwise, no property or interests in property of a specially designated terrorist, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in.

**9.** 31 C.F.R. § 595.204 states:
Except as otherwise authorized, no U.S. person may deal in property or interests in property of a specially designated terrorist, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of a specially designated terrorist.

**10.** 31 C.F.R. § 501.603(a) states:
Any person, including a financial institution, holding property blocked pursuant to this chapter must report. The requirement includes financial institutions that receive and block payments or transfers. This requirement is mandatory and applies to all U.S. persons (or persons subject to U.S. jurisdiction in the case of parts 500 and 515 of this chapter) who have in their possession or control any property or interests in property blocked pursuant to this chapter.

**11.** *See* Government's Exhibit 8 (print-out of HAMAS website dated August 15, 2001 at-

of the HAMAS Political Bureau in 1991. On August 29, 1995, Marzook was added to the SDT list as a threat to the Middle East peace process. *See* 60 Fed.Reg. 44932 (Aug. 29, 1995). Thus, by the end of 1995, both Marzook and HAMAS had been designated under the IEEPA as SDTs.

More recently, on November 7, 2001, President George W. Bush expanded the SDT list by adding, *inter alia,* three other entities pertinent here—Youssef Nada, Ghaleb Himmat and Bank Al Taqwa ("BAT").[12] They were all designated as SDTs for their financing of HAMAS and Al–Qaeda, the infamous SDT responsible for the 9/11 attacks.

The final entity on the *dramatis personae* of this case is Sami Al–Arian who, although not an SDT, is alleged to be a senior member of the Palestinian Islamic Jihad ("PIJ"), an organization that was designated as an SDT pursuant to Executive Order 12947 on January 25, 1995. In February 2003, Al–Arian was indicted and charged with conspiracy, material support to terrorism, and racketeering. *See United States v. Al–Arian,* 267 F.Supp.2d 1258 (M.D.Fla.2003).[13]

## 2. Evidence of Defendant's IEEPA Violations

The extensive documentary record submitted by the government in this case establishes by more than a preponderance of the evidence[14] that defendant dealt in the property of Marzook prior to Marzook's designation as an SDT. Thus, in the course of his investigation, Special Agent Kane reviewed numerous documents relating to BMI-related entities controlled by defendant and found that defendant had, on several occasions, established corporations on behalf of certain BMI investors at the common address of 1 Harmon Plaza, Secaucus, New Jersey 07094. Among these corporations was Mostan International Corporation. Mostan was incorporated in New Jersey on August 1, 1988, and defendant was listed as both its registered agent and Director. Application documents and signature cards for Mostan's bank account at the National Community Bank of New Jersey list Marzook as Mostan's President. Bank records reflect 43 significant transactions in the Mostan bank account, which was handled by BMI, before Marzook's designation as an SDT. An undercover recording of a conversation between a confidential informant for the United States Customs Service and Marzook, which took place on May 1, 1991, also confirms that Marzook invested substantial sums of money with BMI before his designation as an SDT. In addition, files seized from the hard drive of defendant's laptop computer[15] outline and confirm investments made into Mostan from October 24, 1988 through April 15, 1995.[16]

tached to Special Agent Kane's sentencing declaration).

**12.** *See* Government's Exhibit 60 (print-out of Department of Treasury web page entitled "Recent OFAC Actions" attached to Special Agent Kane's sentencing declaration).

**13.** *See also* Government's Exhibit 66 (Indictment of Sami Al–Arian attached to Special Agent Kane's sentencing declaration).

**14.** *See United States v. Melton,* 970 F.2d 1328, 1331–32 (4th Cir.1992) (findings made at sen-

tencing need only be based upon a preponderance of the evidence).

**15.** On June 15, 2003, defendant was arrested pursuant to a federal material witness warrant. A laptop computer was temporarily seized from defendant and, pursuant to his consent, the material contained on its hard drive was imaged by the Bureau of Immigration and Customs Enforcement.

**16.** For example, one file named "I–Mostan" indicates that between October 24, 1988 through January 1, 1991, $1,000,000 was in-

No criminal liability, it appears, attaches to these dealings, nor does the government argue that by themselves they affect defendant's pre-departure sentencing guidelines. This is so because these dealings all occurred before these entities were formally declared SDTs. A different result obtains with respect to any of defendant's dealings with entities after those entities are added to the SDT list. As noted, a person may be committing a felony by dealing in the property of an SDT. Thus, with respect to such dealings, the record here also demonstrates by a preponderance of the evidence that defendant dealt with the property of Marzook after his SDT designation. Specifically, bank records reflect that between February 4, 1991 and October 15, 1996, there were at least 56 transactions that took place in Mostan's bank account managed by BMI. Of these transactions, 19 occurred after HAMAS was designated an SDT on January 25, 1995, and 13 of those 19 transactions occurred after Marzook himself was designated an SDT on August 27, 1995. Files on the hard drive of defendant's laptop computer [17] also support the government's contention that defendant continued to deal in Marzook's property after his SDT designation. For example, a file named "Mostan" lists the final withdrawal from the Mostan account in BMI Construction Fund as a $100,000 withdrawal of investment on November 28, 1996. In reference to the transfer, the file lists "from Soliman acc to Hisham Y.Y.Q. in U.E.A." [18] The document indicates that after this $100,000 withdrawal, Mostan continued to have a $50,669.52 interest in BMI Construction Fund. In addition, bank records reflect a payment from the bank account of Combs Gardens Limited Partnership, a BMI entity, to Mostan's bank account on August 30, 1995 and May 28, 1996, both after Marzook's SDT designation. [19]

The government has presented no evidence, however, that the funds in the Mostan bank account were HAMAS funds. Defendant contends that money moving through the Mostan account subsequent to Marzook's designation was used by BMI to fund BMI construction, leasing, and business development activities in the United States. Indeed, bank records tend to support this claim, as they reflect that the thirteen transactions occurring after Marzook's designation were transactions to and from other BMI entities, such as Combs Garden, BMI Construction, and BMI Leasing. [20]

---

vested into various BMI real estate projects. One hundred thirty-eight thousand dollars was returned to the investor on January 1, 1991 and $90,000 was returned in December 1992. Another file, named "Mostan," includes a document entitled "Status Report 10/15/96 MOSTAN Investment with BMI Inc." This report indicates that $90,000 was withdrawn from the Mostan account and sent to the United Arab Emirates ("UAE") via wire transfer on March 2, 1993. Bank records independently reflect that $90,000 was wired out of Mostan's account at National Community Bank of New Jersey on March 2, 1993 to Marzook's account at Bank of Oman Ltd. in Dubai, UAE.

**17.** See *supra* note 15.

**18.** This is likely an inadvertent transposition of letters and is intended to refer to UAE, the United Arab Emirates.

**19.** Another file on the hard drive of defendant's laptop computer entitled "R.E." includes a spreadsheet listing obligations to investors as of February 7, 1996. This spreadsheet suggests that BMI had an outstanding obligation to pay Mostan $288,000 in its BMI-related New Delta construction projects as of this date.

**20.** The government presented evidence from files on defendant's laptop computer that one such transaction went to "MARC." Defendant presented documents showing that MARC is an American restaurant chain affiliated with boxing champion Muhammad Ali, called

Accordingly, the government has established by more than a preponderance of the evidence that defendant violated the IEEPA through his dealings in Mostan funds after Marzook's SDT designation.[21] More precisely, then, the evidence shows convincingly that defendant (1) dealt in property in which an SDT, *i.e.* Marzook, had an interest and (2) provided services to an SDT, in violation of the IEEPA, 50 U.S.C. § 1705.

It bears noting, however, that the government has presented no evidence that HAMAS had any interest in Mostan, nor has it presented any evidence that defendant committed a "Federal crime of terrorism" ("FTC"), as that term is defined in 18 U.S.C. § 2332b(g)(5). The fact that Marzook is a HAMAS leader, by itself, is insufficient to conclude that the funds handled by defendant for Mostan were therefore HAMAS funds. Thus, the government's evidence, while falling short of showing an FCT, nonetheless clearly establishes the lesser offense of an IEEPA violation. It also appears that the five (5) year statute of limitations applicable to IEEPA violations shields defendant from prosecution for this offense and it is for this reason that the government seeks to have this conduct taken into account in defendant's sentencing for the instant activities.

### 3. Evidence of Defendant's False Statements to Investigators

The government contends that the evidence reflects that defendant made false statements to investigators and that this conduct should be taken into account in defendant's sentencing pursuant to U.S.S.G. § 3A1.4, Application Note 2.[22] Accordingly, this evidence is reviewed here.

#### (a) Youssef Nada & Bank Al Taqwa

On June 15, 2003, during an interview with Special Agents Kane and Balberchak, defendant stated that he had met with Youssef Nada and Ghaleb Himmat in Switzerland on a few occasions. In addition, defendant stated that he had spoken to Nada by telephone a few times as well, but that BMI never had a business relationship with Nada or Himmat, nor had defendant discussed any business propositions with them. Defendant also told the agents that he and BMI were never involved in any transactions with Nada, Himmat or Bank Al–Taqwa ("BAT").

The search of the imaged hard-drive of defendant's laptop disclosed documents relating to a prospective business relationship between defendant/BMI and BAT. One such document was a letter dated May 6, 1996 to Nada. In this letter, defendant offers Nada 51% of issued and outstanding shares of BMI for $5 million. Another document, entitled "Proposal for

"Muhammad Ali Rotisserie Chicken" and that the MARC transactions were to purchase a franchise license to operate a MARC restaurant in Egypt. Pictures and other documents submitted by defendant demonstrate the legitimacy of this enterprise and support defendant's contention that a MARC restaurant did in fact open in Egypt as a result of the purchase of this franchise license.

21. Nor is there any substantial doubt that defendant knew about Marzook's SDT designation given that defendant was a member of the American Muslim Council's Advisory

Board when that organization issued a public statement concerning Marzook on the occasion of his 1995 SDT designation.

22. Application Note 2 provides, in relevant part, that "[f]or purposes of this guideline, an offense that involved ... obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." U.S.S.G. § 3A1.4, comment. (n.2).

Equipment Leasing Fund" dated November 11, 1992 lists as its stated objective the establishment of a Leasing Investment Fund for BAT to be managed by BMI Leasing for short to medium term financing of capital equipment and personal property. The proposed capital investment stated in this document is a total of $5 million to be phased in over three years. Yet, there is no evidence that this business deal was ever consummated and no evidence refutes defendant's contention that this proposal included a financial model, not actual investment figures, and that identical business proposals were sent to several different Muslim financial institutions as a last ditch effort to attract investors to defendant's failing BMI enterprise, none of whom agreed to invest money in BMI. As a result, the evidence on this point is in equipoise, with the result that the government has not shown by a preponderance of the evidence that defendant lied to investigators regarding his relationship with Nada and BAT.

(b) Marzook

During an interview conducted on May 28, 2003, defendant's wife told Special Agents Kane and Balberchak that defendant knew Marzook quite well and that they regularly kept in contact with one another. When Special Agents Kane and Balberchak interviewed defendant upon his arrival at Dulles International Airport from Zurich, Switzerland on June 15, 2003, they asked defendant if he had any personal or business dealings with Marzook. He told the agents that he did not and he stated further that his relationship with Marzook was limited to meeting with him on a few occasions at Islamic conferences dating back to the mid–1980s. In addition, defendant told the agents that he had never handled any money for Marzook or HAMAS, nor had he conducted any transactions for them.[23] Because this statement was plainly false, the government has shown by a preponderance of the evidence that defendant lied to investigators regarding his relationship with Marzook.

(c) Al–Arian

Defendant was also asked about Sami Al–Arian during his interview with Special Agents Kane and Balberchak. He stated that he had met Al–Arian on two or three occasions at Islamic conferences in the United States. He stated he first met Al–Arian at a joint MAYA/ISNA conference in the late 1980s. He also stated that he last saw Al–Arian five years ago at a lecture at the IIIT at Grove Street in Herndon, Virginia. He stated that his relationship with Al–Arian had never gone beyond these conference meetings, thereby excluding any personal or business relationship. Defendant stated that he had never managed any money for or on behalf of Al–Arian and that Al–Arian never invested any money in BMI. He also said that he was not aware until recently that Al–Arian was a senior member of the PIJ.

Special Agent Kane found Al–Arian's contact information in the address book maintained on defendant's laptop.[24] Also,

23. Defendant seeks to refute this characterization of the interview in his responsive pleadings. In this regard, defendant's pleadings reflect that he recalls Special Agent Kane asking him if he knew Marzook and that he answered he did know Marzook, had met him on several occasions and knew a great deal about him because he was constantly in the newspaper. According to defendant's pleadings, Special Agent Kane's questioning of defendant with regard to his relationship with Marzook did not extend beyond this. Special Agent Kane's version is credible and persuasive.

24. In his responsive pleadings, defendant notes that the fact that he had Al–Arian's contact information in his address book does

the documents the government obtained include a check dated October 5, 1993 in the amount of $2500 signed by Al–Arian and made payable to defendant. The check was drawn on an account in the name of a PIJ affiliate, the "Islamic Concern Project and Muslim Women Society," and was deposited into defendant's personal bank account at the National Community Bank in New Jersey. Defendant denies knowledge of the check and it appears that the endorsement signature on the check does not belong to defendant.

In addition, a document seized from Al–Arian pursuant to a federal search warrant in March 2002 is a letter from Al–Arian to defendant. In this letter, Al–Arian proposes that defendant invest in a minority percentage of a strip mall that Al–Arian owned with a partner in return for Al–Arian's promise to purchase defendant's interest in six months time. There is no evidence that this deal was ever consummated or that the letter was ever sent. Defendant denies receiving this proposal. Thus, the evidence in this regard is in equipoise and the government has not shown by a preponderance of the evidence that defendant in fact had business dealings with Al–Arian, which he concealed from the investigators.

## C.  Summary

Distilled to its essence, therefore, the evidence on defendant's dealings with SDTs warrants the following conclusions:

- Defendant incorporated BMI in 1986. He operated and controlled BMI and its many related entities from that time until the company went bankrupt and closed its doors in the late 1990s.

- HAMAS was listed as an SDT organization on January 25, 1995, pursuant to Executive Order.

- Marzook, a political leader of HAMAS, was named an SDT on August 27, 1995.

- Marzook invested money with BMI before his designation as an SDT.

- In 1988, defendant incorporated Mostan International Corporation. The incorporation documents list defendant as Mostan's registered agent and Director. The application documents and signature cards for Mostan's bank account at National Community Bank of New Jersey, established on August 24, 1988, list Marzook as its President.

- Defendant established corporations on behalf of BMI investors at the common address of 1 Harmon Plaza, Secaucus, New Jersey 07094. Mostan shared this common address with BMI and its related entities.

- Bank records for Mostan show that 19 significant transactions in Mostan's bank account managed by BMI took place after HAMAS was designated an SDT. Thirteen of those occurred after Marzook was designated an SDT. The government has not presented evidence, however, that the monies in the Mostan bank account managed by BMI were HAMAS funds. In addition, the thirteen transactions in the Mostan account after Marzook's designation were among various BMI entities in the United States. Still, these transactions show that defendant was dealing in property of an SDT in violation of the IEEPA.

- Defendant's files show distributions from certain BMI real estate projects to individuals the government suggests were fronts for Marzook (particularly Ismail

not contradict the statements he made to the agents. Defendant, in his pleadings, notes that he attempted to secure business cards

from every individual whom he met and entered each of those on his computer.

Elbarasse), after Marzook's designation as an SDT.

- Defendant's files show distributions from BMI construction projects to Mostan's bank account at National Community Bank of New Jersey after Marzook's SDT designation. Bank records also show checks from BMI to Mostan written and deposited in Mostan's bank account after Marzook's SDT designation.

- In an interview with Special Agents Kane and Balberchak, defendant falsely stated that he did not have any personal or business dealings with Marzook and had never handled any money for Marzook.

- There is no evidence that defendant engaged in any direct handling of HAMAS funds.

- There is no evidence that any of the money handled by defendant was ever used to fund a terrorist attack.

- There is no evidence that defendant committed, or calculated to promote, an FCT.

### III.

█ The starting point in the sentencing guidelines analysis is Appendix A, which specifies the applicable guidelines for the statutes of conviction. If more than one guideline section is referenced for a particular statute in Appendix A, courts should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G.App. A. In the case of defendant's conviction under 18 U.S.C. § 1425(a), the parties agree that the applicable guideline is § 2L2.2. Appendix A in fact lists two guidelines for a § 1425 conviction: §§ 2L2.1 and 2L2.2. Yet, it is clear, as the parties agree, that § 2L2.2 is the guideline "most appropriate for the offense conduct" charged in Count 1, as

§ 2L2.1 is directed to "Trafficking in a Document Relating to Naturalization, Citizenship, or Legal Resident Status, or a United States Passport; False Statement in Respect to the Citizenship or Immigration Status of Another; Fraudulent Marriage to Assist Alien to Evade Immigration Law." U.S.S.G. § 2L2.1. Section 2L2.2, on the other hand, focuses sharply on "Fraudulently Acquiring Documents Relating to Naturalization, Citizenship, or Legal Resident Status for Own Use." U.S.S.G. § 2L2.2. Therefore, the appropriate base offense level for defendant's § 1425(a) conviction is 8.

While the parties agree on the applicable guideline for the § 1425(a) conviction, they are in sharp disagreement as to the guideline applicable to defendant's § 1015(a) conviction. The government contends that the perjury guideline, § 2J1.3, should be applied because defendant appeared before an INS district adjudications officer, raised his right hand, and swore to the false statements contained in his Application for Naturalization and the false statements sworn to were themselves made in violation of 18 U.S.C. §§ 1001(a) and 1015(a). In response, defendant contends that § 2L2.2 is also the appropriate guideline for this conviction because it specifically covers defendant's offense conduct, namely fraudulently obtaining naturalization.

█ This dispute requires determining which is the guideline "most appropriate for the offense conduct charged" in Count 3, the § 1015(a) count. U.S.S.G.App. A. In making this determination, a "district court should compare the guideline texts with the charged misconduct, rather than the statute (which may outlaw a variety of conduct implicating several guidelines) or the actual conduct (which may include factors not elements of the indicted offense)." *United States v. Lambert,* 994 F.2d 1088,

1092 (4th Cir.1993); *accord United States v. Parsell*, 815 F.Supp. 84, 87 (D.Conn. 1993). Here, the charged misconduct, as described in Count 3, is that defendant made certain false statements under oath relating to naturalization in his Application for Naturalization before an INS district adjudications officer. In so doing, defendant perpetrated a fraud on the INS to obtain his own naturalization. This charged misconduct must now be compared to the texts of the two competing guidelines.

The text of § 2L2.2 clearly focuses specifically on naturalization fraud, while the text of the § 2J1.3 perjury guideline is more general in scope.[25] The charged misconduct in Count 3 is more precisely described by § 2L2.2 than by § 2J1.3. Section 2J1.3 relates to "Perjury or Subornation of Perjury; Bribery of Witness." It is clear that "[t]he definition of perjury under the Sentencing Guidelines is the same as that which obtains under substantive federal criminal law." *United States v. Smith*, 62 F.3d 641, 646 (4th Cir.1995). Perjury, therefore, "contains three elements: (1) false testimony (2) concerning a material matter (3) given with the willful intent to deceive (rather than as a result of, say, confusion, mistake, or faulty memory)." *Id.* The dictionary definition of perjury similarly defines perjury as "[t]he act or an instance of a person's deliberately making *material* false or misleading statements while under oath." *Black's Law Dictionary* (7th ed.1999) (emphasis added). Thus, materiality is a necessary element of perjury. Count 3 charges defen-

dant with making false statements under oath in a matter relating to naturalization, specifically regarding his answers at Part 3 and Part 7 of his Application for Naturalization; it does not charge defendant with making *materially* false statements under oath. *Lambert* requires a sentencing court to compare the guideline texts "to the *charged* misconduct, rather than the statute ... *or the actual conduct* (which may include factors *not elements of the indicted offense*). 994 F.2d at 1092 (emphasis added). Thus, while defendant's false statements may well have been material, Count 3 does not charge defendant with making materially false statements.[26] Given this, the charged misconduct is more congruent with guideline § 2L2.2, which is specific to naturalization fraud, than it is with guideline § 2J1.3, which is far more general in scope, does not focus on naturalization fraud and includes an element not present in the charged conduct. This greater congruency warrants the conclusion that § 2L2.2 is the more appropriate guideline.

Although there is no controlling authority squarely addressing this guidelines choice issue, significant support for the result reached here is found in *United States v. Abuagla*, 336 F.3d 277 (4th Cir. 2003). The defendant in *Abuagla* engaged in misconduct strikingly similar to that charged in Count 3 of this defendant's indictment. There, defendant was convicted for a violation of 18 U.S.C. § 1015(a) for submitting an Application for Naturalization in which he falsely answered "no" to the question of whether he had ever been

---

**25.** Indeed, the commentary to § 2J1.3 does not cite 18 U.S.C. § 1015 as one of the statutory provisions to which this guideline applies. While this is not conclusive given that Appendix A lists § 2J1.3 as possibly applicable to a § 1015 conviction, it is some indication that § 2J1.3 is not the primary guideline applicable to § 1015 convictions.

**26.** Indeed, as the Fourth Circuit recently made clear, a violation of 18 U.S.C. § 1015(a) does not require materiality. *See United States v. Abuagla*, 336 F.3d 277, 278 (4th Cir.2003).

arrested for breaking or violating any law, excluding traffic violations. *See* 336 F.3d at 278. There was, it appears, no dispute in *Abuagla* that § 2L2.2 was the correct guideline. The same result should obtain here for the same reasons.

Also worth noting in connection with the determination of which guideline section is most appropriate to apply to defendant's § 1015(a) conviction is the government's concession that defendant's conviction under § 1015(a) is a lesser included offense of his conviction under § 1425(a), and if both convictions survive appeal, the former must be vacated in favor of the latter. Given this, it seems inappropriate to apply a different sentencing guideline for this conviction when, in the end, this conviction may be vacated. Put differently, defendant's § 1015(a) conviction, which is the lesser included offense, should not be the tail that wags the sentencing dog. This anomaly is avoided in the event that § 2L2.2 is selected as the most appropriate guideline for defendant's § 1015 conviction.

In sum, then, defendant's base offense level for both convictions is 8 and pursuant to § 3D1.1, which governs grouping, no levels are added when the offenses are grouped. Thus the total base offense level for the convictions is 8 and the next step in the guidelines analysis is to consider what enhancements are warranted.

**IV.**

**A. § 3A1.4**

The government's initial sentencing position was that defendant's naturalization fraud conviction constitutes "an offense [that] is a felony that involved, or was intended to promote [an FCT]," as defined in 18 U.S.C. § 2332b(g)(5), from which it followed that his sentence should be enhanced pursuant to § 3A1.4 of the sentencing guidelines.[27] More particularly, the government argued that the term "offense" in § 3A1.4 included "relevant conduct," as defined in § 1B1.3 and that defendant's naturalization fraud included relevant conduct intended to promote terrorism in that defendant "established as a bridgehead in America by securing first status as a permanent resident and then a citizen in order to operate BMI which had, among its purposes, acting as a conduit for funds intended for HAMAS." Government's Memorandum Regarding Sentencing at 10.

In the end, the government abandoned this argument, conceding that it could not prove by a preponderance of the evidence that defendant's dealings in property of an SDT in violation of the IEEPA were specifically intended to promote any FCT. Indeed, the government conceded that it could not trace any BMI or Mostan funds to HAMAS or to a specific terrorist act and that an IEEPA violation is not an

---

**27.** Section 3A1.4(a) of the guidelines states that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32." U.S.S.G. § 3A1.4. Application Note 1 to § 3A1.4 states that " 'Federal crime of terrorism' is defined at 18 U.S.C. § 2332b(g)(5)." That subsection, which supplies definitions for the crime of "Acts of terrorism transcending national boundaries," provides that the term "Federal crime of ter-

rorism" means an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" *and* is one of a series of specific violations, including violations of 18 U.S.C. §§ 956(a)(1) (relating to conspiracy to murder, kidnap or maim persons abroad), 2332b (relating to acts of terrorism transcending national boundaries); and 2339A (relating to providing material support to terrorists).

FCT enumerated in 18 U.S.C. § 2332b(g)(5)(B).

After abandoning this argument, the government turned next to Application Note 2 of § 3A1.4 to argue that an obstruction-based enhancement under that Note [28] was warranted. Specifically, the government argued that defendant's false statements to investigators constituted "relevant conduct" and hence were part of the "offense" in Application Note 2 and further that this conduct by defendant "obstructed an investigation of a federal crime of terrorism" under that Note.

Again, however, the government, in the end, abandoned this argument, too, conceding that the evidence did not show that the false statements to investigators obstructed an investigation of an FCT.

What remains, therefore, is the government's final § 3A1.4 argument, namely that Application Note 4 [29] applies because defendant's offenses of conviction were calculated to influence or affect the conduct of government by intimidation or coercion, but did so through the promotion of an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), namely offenses under the IEEPA.[30] In response, defendant argues (i) that his IEEPA violations are not relevant conduct to his conviction for naturalization fraud; and (ii) even if his IEEPA violations are relevant conduct to his offenses of conviction, there is no evidence that any of defendant's IEEPA violations were calculated to influence or affect the

conduct of government by intimidation or coercion, as required by the plain language of Application Note 4.

The key threshold question, then, is whether the conduct that comprises defendant's IEEPA violations is relevant conduct to the offenses of conviction. If so, then the second question that must be addressed before an upward departure is warranted under Application Note 4 of § 3A1.4 is whether defendant's offenses of conviction and his IEEPA violations were "calculated to influence or affect the conduct of government by intimidation or coercion." U.S.S.G. § 3A1.4, comment. (n.4). The government's evidence falls short in both respects: Defendant's IEEPA violations are not relevant conduct and, even assuming the contrary, the evidence does not show that his offenses of conviction, including his IEEPA violations, were calculated to influence or affect the conduct of government by intimidation or coercion.

■ Under the sentencing guidelines, " '[o]ffense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct), unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 comment. (n.1(H)). And "relevant conduct" is defined as:

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

---

**28.** *See supra* note 22.

**29.** Application Note 4 of § 3A1.4 states, in relevant part, that if

the offense was calculated to influence or affect the conduct of government by intimidation or coercion ... but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C.

§ 2332b(g)(5)(B) .... In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

**30.** 50 U.S.C. § 1701 *et seq.*

(B) in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.[31]

U.S.S.G. § 1B1.3. It follows from this definition of relevant conduct that defendant's IEEPA violations are relevant conduct only if they "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3. In other words, the government must show that defendant's IEEPA violations are connected to, or in some way part of, preparing and/or avoiding detection for the naturalization fraud. To this end, the government claims that defendant fraudulently procured his naturalization in order to facilitate his IEEPA violations, which in turn had the purpose of promoting terrorism; therefore defendant's IEEPA violations are relevant conduct to his naturalization fraud scheme. Yet, this is not what § 1B1.3 requires. To be relevant conduct, defendant's IEEPA violations must have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3. Still, in this respect, the government invites drawing the speculative inference that defendant may have found it easier to travel with both an American and an Egyptian passport and that United States citizenship may have made defendant feel more secure in engaging in IEEPA violations. Yet, the government presented no evidence to support this speculation and indeed the trial evidence reflects that defendant apparently had no difficulty traveling extensively on an Egyptian passport. Moreover, a contrary inference is equally inviting. As a permanent resident of the United States, defendant could have continued to operate his BMI enterprises indefinitely. Instead, he chose to apply for United States citizenship and, in so doing, submitted to the government under oath information he knew to be false. By applying for naturalization, defendant invited greater government scrutiny of him and his immigration status, thereby jeopardizing his then secure permanent resident status. Thus, the inferences that might be drawn in these circumstances stand in equipoise; it follows, therefore, that the government has not proven by a preponderance of the evidence that defendant procured his naturalization in order to engage in financial dealings with terrorists. Indeed, the government has presented absolutely no evidence regarding defendant's motivation in procuring his naturalization.

▪ Even assuming that defendant's IEEPA violations are relevant conduct with respect to his offenses of conviction, the evidence does not persuasively establish that this conduct was "calculated to influence or affect the conduct of government by intimidation or coercion," as Application Note 4 requires. Nor is it persuasive to argue, as the government does, that an IEEPA violation involving an SDT

---

**31.** Additionally, § 1B1.3(a)(2) provides that solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, [relevant conduct includes] all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction.

The government did not argue for, nor does the evidence support, application of this portion of § 1B1.3.

is *per se* calculated to influence or affect government conduct by intimidation or coercion. This argument misapprehends both the nature of an FCT and Application Note 4 and its function.

Application Note 1 to § 3A1.4 states that "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." Section 2332b(g)(5), in turn, provides:

> (5) the term "Federal crime of terrorism" means an offense that—
>
> A. is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; *and*
>
> B. is a violation of [a long list of enumerated offenses].

18 U.S.C. § 2332b(g)(5) (emphasis added). Thus, an essential element that must be shown to prove an FCT is that the conduct was calculated to influence or affect the conduct of government by intimidation or coercion. Further, the definition of FCT lists specific code violations, including those relating to harboring terrorists, providing material support to terrorists, and financing terrorism. Importantly, none of the listed violations are defined as *per se* calculated to influence or affect government by intimidation or coercion; none of the listed violations are presumed to have this effect. Given this, it would be illogical to conclude, as the government argues, that an IEEPA violation should be conclusively presumed to include this element.

This conclusion becomes particularly clear when the proper function of Application Note 4 is considered. Where, as is not true here, the offense of conviction, including relevant conduct, involves, or was intended to promote an FCT, then it is guideline § 3A1.4 itself that applies, not Application Note 4. Some offenses that are not FCTs nonetheless have the same effect as an FCT. It is the function of Application Note 4 to invite an upward departure in the event the offense of conviction, including relevant conduct, does not involve or promote an FCT, but nonetheless has the same effect as an FCT in influencing or affecting the conduct of government by intimidation or coercion. Thus, just as this intimidation and coercion of government element is not presumed and must be shown to establish an FCT for purposes of applying § 3A1.4, so, too, must this element be shown and not presumed if the offense is not an FCT, yet an upward departure is sought under Application Note 4 because the effect of the offense is essentially the same.

In sum, the government has not produced evidence to support the notion that defendant's IEEPA violations were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. As a result, even if defendant's IEEPA violations were relevant conduct, Application Note 4 does not apply.[32]

### B. § 3B1.1

Next, the government contends that defendant should receive a four level en-

---

**32.** Of course, there may well be circumstances in which an IEEPA violation has the same effect as an FCT, in which event, if the IEEPA violation is the offense of conviction or relevant conduct, an upward departure pursuant to Application Note 4 may be warranted. An IEEPA violation does not come within this class of violations simply because an SDT is involved. For example, one would be hard-pressed to conclude that a major American bank that failed to freeze or report the assets of a newly-designated SDT thereby calculated to influence or affect government conduct by intimidation or coercion, although clearly such a bank would have committed an IEEPA violation involving an SDT.

hancement under § 3B1.1 because "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).[33] In support of this contention, the government points out that defendant directed the participation of Hussein Ibrahim in this offense and directed Gamal Ahmed to notarize a false letter dated December 9, 1993. Moreover, the government argues that defendant's organization was "otherwise extensive" under § 3B1.1 in that he used the unknowing services of the Department of Labor, the Department of State, and the INS in his scheme to become a naturalized citizen.

■ It is clear that "a 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1); *see also United States v. Fells,* 920 F.2d 1179, 1182 (4th Cir.1990) (only criminally responsible individuals may be counted as participants under § 3B1.1). In addition, a defendant may be counted as a participant under § 3B1.1. *See Fells,* 920 F.2d at 1182. It follows, therefore, that there were three participants in defendant's criminal activity: defendant himself, Ibrahim, and Ahmed. The evidence presented at trial showed that defendant was President of BMI, that Ibrahim was BMI's Vice President and that Ahmed was a BMI employee. As such, it can be inferred that Ibrahim and Ahmed knew the falsity of the statement that defendant was being offered the position of BMI Vice President and thus were criminally responsible for their participation in the fraudulent conduct. Furthermore, because Ibrahim, as Vice President of BMI, was defendant's

employee, it can also be inferred that defendant directed Ibrahim (i) to sign defendant's fraudulent Application for Alien Employment Certification as BMI's President in 1991; (ii) to sign and submit a fraudulent Immigrant Petition for Alien Worker to the INS, with an attached letter falsely offering defendant the position of Vice President in 1993; and (iii) to sign a letter dated December 9, 1993 notarized by Ahmed stating that upon defendant's arrival into the United States, he would be employed as Vice President of BMI. Similarly, it can be inferred that Ahmed, as defendant's subordinate employee, was also directed by defendant to notarize the fraudulent December 9, 1993 letter. Therefore, the government has shown defendant was an organizer or leader of criminal activity that involved three participants.

Unknowing individuals within the Department of Labor, the Department of State, and the INS cannot be considered participants because they were not criminally responsible for any of defendant's criminal activity. Application Note 3 to § 3B1.1, however, does provide that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n.3).

The Second Circuit has determined that the "otherwise extensive" prong of § 3B1.1 demands a showing that an activity is the functional equivalent of an activity involving five or more participants. *United States v. Carrozzella,* 105 F.3d 796, 803 (2d Cir.1997); *accord United States v. Tai,* 41

---

**33.** The Probation Officer vacillated on this issue, concluding first that no role enhancement was warranted and later agreeing with

the government's argument for a four level role enhancement.

F.3d 1170, 1174 (7th Cir.1994). The Second Circuit thus enunciated the following test to determine whether a criminal activity is "otherwise extensive" as the functional equivalent of one involving five or more knowing participants: The sentencing court must determine

    A.  the number of knowing participants;

    B.  the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent;

    C.  the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*Carrozzella*, 105 F.3d at 803–04.[34] In applying this test, it is clear, as noted earlier, that there were three knowing participants in defendant's scheme to fraudulently obtain his own naturalization. It is also clear that the services of the Department of Labor, the Department of State, and the INS were peculiar and necessary to defendant's criminal scheme. Equally significant and clear, however, is the fact that the activities of the Department of Labor, the Department of State, and the INS were not organized or led by the defendant. In essence, defendant requested that his immigration applications be acted upon by the relevant government agencies. It is true that these applications contained fraudulent material, but by submitting them under oath, defendant did not organize or lead the independent activities of the individuals within each agency who processed and acted upon his fraudulent applications and other relevant paperwork. Therefore, defendant's criminal activity was not "otherwise extensive" for purposes of § 3B1.1 and a four-level enhancement is thus unwarranted.

■ A two-level enhancement under § 3B1.1(c) is warranted, however, because defendant was an organizer or leader of criminal activity that involved three participants: himself, Ibrahim, and Ahmed. As a result, defendant's offense level should be increased to 10.

## C. § 5K2.0

■ Next, the government argues that if Application Note 4 of § 3A1.4 does not apply, an upward departure pursuant to § 5K2.0 applied to § 3A1.4 is warranted because there exists an aggravating circumstance of a kind or degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, and thus this case is unusual enough to take it out of the heartland of cases contemplated by the guidelines. In this regard, the government argues that defendant clearly obstructed a terrorism investigation and facilitated financial transactions with terrorists both before and after their SDT designations through the operation of BMI and its related entities. Furthermore, the government again contends that defendant's business dealings and IEEPA violations were intimately connected with his fraud against the Department of State, the Department of Labor, and the INS. In pursuing this theory, therefore, the government essentially makes the same arguments it made previously for application of § 3A1.4, including use of Application Notes 2 and 4, with one difference. Now the government also relies on evidence of defendant's pre-designation dealings with SDTs.

In *United States v. Rybicki*, 96 F.3d 754 (4th Cir.1996), the Fourth Circuit set forth an analysis for sentencing courts to follow

---

**34.** This test has been adopted by numerous other circuits. *See United States v. Anthony*, 280 F.3d 694, 699–701 (6th Cir.2002); *United States v. Wilson*, 240 F.3d 39, 47–51 (D.C.Cir. 2001); *United States v. Helbling*, 209 F.3d 226, 244–48 (3d Cir.2000).

when deciding whether to depart under § 5K2.0. First, the district court "must determine the circumstances or consequences of the offense of conviction." *Id.* at 757. The circumstances and consequences of defendant's convictions under 18 U.S.C. §§ 1425(a) and 1015(a) are described fully in Part II.A of this memorandum opinion. Next, under *Rybicki*, the district court must decide "whether any of the circumstances or consequences of the offense of conviction appear 'atypical,' such that they potentially take the case out of the applicable guideline's heartland." *Id.* It does not appear that any of the circumstances or consequences of defendant's offenses of conviction are atypical. Defendant made false statements under oath on his Application for Naturalization. These false statements concerned defendant's absences from the United States in the five years preceding his Application for Naturalization and other immigration fraud crimes he had committed to procure his permanent resident status, but for which he was never arrested. These other crimes for which defendant had never been arrested involved false statements about a fictitious offer of employment from a company he in fact had founded. The consequence of defendant's false statements is that he was able to become an American

citizen. As noted earlier, the government has not proven by a preponderance of the evidence that defendant's IEEPA violations were relevant conduct for purposes of his offenses of conviction. As a result, the government has not shown that the IEEPA violations were a circumstance or consequence of submitting false statements under oath in a naturalization proceeding and thus procuring his own naturalization contrary to law. The same is true for defendant's pre-designation dealings with SDTs.[35] The fact that the defendant lied to investigators about the extent to his relationship with Marzook is also not relevant conduct to defendant's offenses of conviction, as the government conceded in abandoning its argument under Application Note 2 to § 3A1.4, and, therefore, it also is not a circumstance or consequence of his offenses of conviction. Because none of the circumstances or consequences of defendant's offenses of conviction appear to be atypical, the next three steps in the *Rybicki* analysis need not be undertaken,[36] and a departure pursuant to § 5K2.0 is unwarranted.

### V.

Accordingly, defendant's final offense level is 10 and his criminal history category is I.[37] Defendant received the maximum

---

**35.** There is also an evidentiary problem with relying on this pre-designation evidence for an upward departure pursuant to § 5K2.0: The government has not presented persuasive evidence that before Marzook's designation in 1995, defendant knew Marzook was a terrorist or was engaged in promoting terrorist activities. All of defendant's pre-SDT designation financial transactions with Marzook were legal.

**36.** After having identified any potentially atypical circumstances or consequences of the offense of conviction, the third step in the analysis is to identify each of these factors "according to the Guidelines' classifications as a 'forbidden,' 'encouraged,' or 'unmen-

tioned' basis for departure." *Rybicki*, 96 F.3d at 757. The fourth step requires further analysis of factors that are "encouraged," "discouraged," or "unmentioned." *Id.* Finally, as the last step, "the district court must consider whether the circumstances and consequences appropriately classified and considered take the case out of the applicable guideline's heartland and whether a departure from the guideline's specified sentencing range is therefore warranted." *Id.*

**37.** The government did not seek an upward departure in criminal history category pursuant to § 4A1.3 based on defendant's unprosecuted violations of the IEEPA.

12 months imprisonment and a $15,000 fine, a $100 special assessment and 3 years of supervised release. Defendant is also required to cooperate with the Bureau of Immigration and Customs Enforcement to effect his prompt removal from the United States upon his release and payment of the fine. Failure to pay the fine would constitute a violation of defendant's supervised release and might result in his being returned to prison for the full supervised release term, in which event his removal from this country would be delayed accordingly.

Finally, it is worth noting that if, as the government argues, defendant served as a banker and money handler for terrorists and a financial supporter of terrorism, then it is both ironic and admirable that it is this country, the terrorist's primary target, and this country's commitment to the rule of law that guaranteed to defendant and provided him with a fair trial and saved him from a more severe sentence that many observers, based on compelling suspicions, believe he deserves.