UNITED STATES of America,

v.

Soliman S. BIHEIRI, Defendant.

No. 1:04CR201.

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 9, 2005.

David H. Laufman, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Wilfred Ward Yeargan, III, Law Offices of Wilfred Ward Yeargan III, Fairfax, VA, Ashraf Wajih Nubani, Busch & Nubani PC, Annandale, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In its post–9/11 determination to crack down on domestic terrorism financing, the government twice prosecuted defendant Soliman Biheiri. Yet, neither prosecution directly charged terrorism financing, as the statute of limitations had expired on such charges.[1] Instead, the government sought to hold Biheiri accountable for his terrorism financing activities through the application of various Sentencing Guidelines enhancements and departures. Although the government won convictions in both cases, it fell short in its efforts to enhance Biheiri's sentence to account for his terrorism financing activities. This Memorandum Opinion addresses the issues raised and resolved in Biheiri's second sentencing proceeding.

## I.

The first prosecution of Biheiri occurred in October 2003 and focused solely on his activities in acquiring United States citizenship by naturalization. Specifically, the government in that prosecution alleged and proved at trial that Biheiri (i) procured his naturalization by fraud, in violation of 18 U.S.C. § 1425(a); and (ii) swore to false statements made in his naturalization application, in violation of 18 U.S.C. § 1015(a). At sentencing, the government sought to increase Biheiri's Guidelines sentence through the application of a terrorism-related sentencing enhancement pursuant to U.S.S.G. § 3A1.4 or, alternatively, to accomplish the same result via an upward departure pursuant to U.S.S.G. § 5K2.0. For various reasons, both attempts were unsuccessful, and in January 2004, after being stripped of his American citizenship, Biheiri was sentenced to twelve months incarceration.[2]

While Biheiri was serving this sentence, a federal grand jury returned a second indictment against him. This three-count indictment was based on events that occurred on June 15, 2003, when Biheiri, on returning to the United States after approximately one year abroad, was consensually interviewed for almost five hours by federal agents at Washington Dulles International Airport. According to the indictment, Biheiri made material false statements to the agents during the interview. Specifically, Counts 1 and 2 alleged that Biheiri, in violation of 18 U.S.C. § 1001(a), falsely told the agents that he did not have a business relationship with, nor had he handled money for, either Mousa Abu Marzook (Count 1) or Sami Al–Arian (Count 2), both of whom were affiliated with terrorist organizations. At all times relevant to the indictment, Marzook was a senior member of HAMAS, a Palestinian terrorist organization responsible, among other things, for suicide bombings against Israeli civilian and military targets. *See Biheiri I*, 299 F.Supp.2d at 596–97. In 1995, Marzook, as one of HAMAS's politi-

1. Such charges might have been brought under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, which has a 5–year statute of limitations.

2. For a detailed description of the first prosecution and conviction, as well as the sentencing issues raised and resolved in that case, see *United States v. Biheiri*, 299 F.Supp.2d 590 (E.D.Va.2004) ("*Biheiri I*").

cal leaders, was designated a Specially Designated Terrorist ("SDT") under the IEEPA. *See id.* at 598. Al–Arian, although not himself an SDT, was at all relevant times alleged to be a senior member of Palestinian Islamic Jihad, an SDT organization. *See id.* Count 3 alleged that on the same date, Biheiri violated 18 U.S.C. § 1546(a) by possessing and using a U.S. passport that he had obtained by making false statements on his naturalization application. In July 2004, a federal grand jury returned a superseding indictment that supplemented Counts 1 and 2 by adding the allegation that Biheiri's false statements concerning his business relationships with Marzook and Al–Arian had served to obstruct an investigation of a federal crime of terrorism. By adding this additional allegation, the government sought to lay the foundation for a terrorism-related sentencing enhancement pursuant to § 3A1.4.[3]

In August 2004, Biheiri moved to dismiss Counts 1 and 2 on various grounds, including collateral estoppel. In particular, Biheiri argued that the government should be collaterally estopped from seeking a § 3A1.4 sentencing enhancement based on the false statements alleged in Counts 1 and 2 because it had relied on the same false statements in its earlier unsuccessful attempt impose a § 3A1.4 enhancement in the first prosecution. For reasons

stated in a Memorandum Opinion dated October 19, 2004, Biheiri's motion was granted only with respect to Count 2. *See United States v. Biheiri,* 341 F.Supp.2d 593, 603–04 (E.D.Va.2004) (*"Biheiri II "*). Accordingly, on the eve of trial, only Counts 1 and 3 of the superseding indictment remained.

On October 6, 2004, immediately prior to the commencement of his trial, Biheiri pled guilty to Count 3 of the superseding indictment. Accordingly, Biheiri was tried solely on Count 1, and on October 12, 2004, the jury returned a verdict of guilty on that count. By agreement of the parties prior to trial, the question whether Biheiri's false statements had obstructed a federal terrorism investigation was not submitted to the jury, but was instead reserved for the Court to resolve, if necessary, at sentencing.[4] The jury's verdict, therefore, constituted a finding that Biheiri made material false statements to federal agents about his relationship with Marzook, in violation of 18 U.S.C. § 1001(a), but not a finding that in doing so he had obstructed a federal terrorism investigation such that he should receive a § 3A1.4 sentencing enhancement.

In post-trial memoranda and oral argument, the parties disputed various Sentencing Guidelines issues, including the application of the § 3A1.4 terrorism enhancement. Although the recent decision

---

**3.** *See* UNITED STATES SENTENCING GUIDELINES MANUAL § 3A1.4, Application Note 2 (2004) [hereinafter U.S.S.G.]. The impetus for including Guidelines sentencing factors in the superseding indictment against Biheiri was *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which, by invalidating the State of Washington's guidelines sentencing scheme on Sixth Amendment grounds, suggested that juries, rather than judges, were required to determine the applicability of sentencing factors under the federal Sentencing Guidelines. Although the Supreme Court has since rejected this suggestion by making the federal Sen-

tencing Guidelines advisory, *see United States v. Booker,* —— U.S. ——, ———–——, 125 S.Ct. 738, 756–57, —— L.Ed.2d ——, ———–—— (2005), *Blakely 's* effect on federal criminal sentencing was unclear during this prosecution, and hence the government prudentially included § 3A1.4 allegations in the superseding indictment.

**4.** In this regard, Biheiri knowingly and voluntarily waived any right he might have had under *Blakely* or its progeny to have a jury determine beyond a reasonable doubt whether he should receive a § 3A1.4 sentencing enhancement.

in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, —— L.Ed.2d —— (2005), holds that the Sentencing Guidelines ranges are no longer mandatory, Justice Breyer's majority opinion in that case sensibly teaches that the Sentencing Guidelines must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. *See id.* at 757; *see also United States v. Hughes*, 396 F.3d 374, 377–78 (4th Cir.2005). Importantly, however, neither reached nor addressed in *Booker* is the question of the proper weight to be accorded to the Guidelines results in the sentencing calculus under § 3553(a): Are the Guidelines entitled to "heavy weight," as one district court has ruled, or is a less deferential approach warranted, as another has concluded? *Compare United States v. Wilson*, —— F.Supp.2d ——, No. 2:03–CR–882 PGC (D.Utah. Jan. 13, 2005) ("heavy weight") *with United States v. Ranum*, 353 F.Supp.2d 984 (E.D.Wis.2005) (noting inconsistencies between Guidelines and § 3553(a) factors). Also not reached or decided in *Booker* is the somewhat more subtle question whether the Sentencing Guidelines "range" to be considered in the § 3553(a) sentencing calculus is the range determined by the base offense level, reflecting only what the jury found, or the range determined by the adjusted or final offense level, reflecting also the sentencing judge's determinations as to enhancements, departures, and downward adjustments. *Cf. Hughes*, at 380–82 (approving use of a sentencing range based on the final offense level, but the question was neither squarely presented nor explicitly addressed). Nor is this an unimportant point, for it is easy to see that if the final offense level sentencing range is used as the § 3553(a) factor and also accorded

"heavy weight," the result might well be precisely what *Booker* condemned, namely the sentencing of a defendant on the basis of Sentencing Guidelines factors found by a judge by a preponderance of the evidence, rather than by a jury beyond a reasonable doubt. *See Booker*, —— U.S. at ——, 125 S.Ct. at 756.

In any event, only the first question—the weight to be accorded the Guidelines range—is material here, as Biheiri rendered the second question moot by waiving any right he might have had under *Booker* to have a jury find all the facts relevant to his sentence. *See supra* note 4. The key to answering the first question is found in § 3553 itself. Subsection (a) lists the factors to be considered in imposing a sentence, but does not differentiate among the factors in terms of the importance or weight to be accorded to any of them. Subsection (b), now invalidated by *Booker*, formerly served this function by explicitly making Guidelines sentencing mandatory. With the demise of subsection (b), the statute no longer provides any explicit basis for according greater weight to the Guidelines or to any other factor in every case. Yet, this does not end the analysis, as implicit guidance on the proper role of the Sentencing Guidelines can be found in subsections (a)(4), (a)(6), and (c), coupled with the statute's structure. Subsection (a)(4) requires the Guidelines sentencing range to be considered as one of the factors in sentencing. Subsection (a)(6) sheds light on the proper role of the Guidelines sentencing ranges by calling upon sentencing judges to take care to avoid unwarranted disparities, a difficult task without the sort of benchmark that the Guidelines provide.[5] Nor should the importance of this goal be understated; it is central to a

---

5. Section 3553 does not elucidate what is meant by "unwarranted disparities." It is unclear, for example, whether disparities arising between federal circuits as a result of

local legal cultures are "unwarranted." The resilience of such local cultures is illustrated by a comparison of federal sentencing statis-

just sentencing process, given that the essence of justice is that like cases should be treated alike, and importantly, should be seen to be treated alike, which brings us to the important role of subsection (c). Subsection (c) requires the sentencing judge to state the reasons for the imposition of a particular sentence, including the reasons for any deviation from the Guidelines sentencing range and the effects of the other § 3553(a) factors in setting the sentence. In providing the reasons for imposing a particular sentence, the sentencing judge can explain deviations from the Guidelines sentencing range in terms of the greater significance to the case of other § 3553(a) factors.[6] In this way, like cases will be seen as being treated alike whereas differences in treatment of apparently similar cases can be understood as warranted by the material differences in the cases, as illuminated by § 3553's rational methodology.

Fairly read and taken as a whole, therefore, § 3553 calls upon sentencing judges to consider specific enumerated factors, including the Sentencing Guidelines range,

and then to impose a sentence that is sufficient but not greater than necessary to comply with the goals of (i) promoting respect for the law, (ii) providing just punishment for the offense given the seriousness, (iii) affording adequate deterrence to criminal conduct, (iv) protecting the public, and (v) providing the defendant with reasonable rehabilitative opportunities.[7] See 18 U.S.C. § 3553(a) (2004).

Importantly, however, fashioning a just sentence cannot be reduced to a mere arithmetical exercise. Reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produces an illusory precision that obscures the fact that sentencing, in the end, must involve the exercise of *judgment*, *i.e.*, a judge's discerning opinion that results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals.

In sum, then, it remains appropriate in this case to consider and resolve any Sentencing Guidelines disputes so as to arrive at a sentencing range for Biheiri, which

tics across different regions. Such statistics reflect that the Guidelines have been quite successful in reducing intra-district and intra-circuit disparities, but considerably less effective with respect to inter-circuit disparities. For example, the statistics reflect that the rate of downward departures attributable to factors other than substantial assistance is generally below 10% in the Fourth Circuit and 4% in Virginia, whereas the rate for the same downward departures exceeds 54% in the Southern District of California and 60% in Arizona. *See* 2002 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, Appendix B. The latter rate may, of course, be attributable to a high volume of cases involving illegal aliens. Also worth noting are the obvious and well-publicized disparities in sentences imposed in the federal and state systems, which, of course, the federal Sentencing Guidelines are powerless to affect in any direct manner.

6. No individual factor is singled out as having greater weight; instead, the richness of factu-

al diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances. Thus, the Guidelines sentencing range is not entitled to "heavy weight," but it is a useful starting point in fashioning a just and appropriate sentence. *But see Wilson*, No. 2:03–CR–882 PGC (D.Utah. Jan. 13, 2005).

7. Conceivably, a sentencing judge may consider that the Sentencing Guidelines range is too harsh or too lenient in certain circumstances. For example, a sentencing judge may consider that in light of the other § 3553 factors, the Sentencing Guidelines range is inappropriate because that range is based on (i) inapposite and outdated historical data inconsistent with the § 3553 factors, or (ii) on similarly inapposite policy judgments of the Sentencing Commission, such as the severity of the crack cocaine sentencing ranges.

should then be one of the § 3553(a) factors to be considered in imposing an appropriate sentence. And, the proper starting point in the Sentencing Guidelines analysis is to set forth the facts bearing on Biheiri's Sentencing Guidelines range. *See Hughes,* at 379–80.

## II.[8]

Biheiri is an Egyptian-born and Swiss-educated international financier who first came to the United States in 1985 on a six-month tourist visa. Over the next several years, he made a series of false statements both on official forms and directly to government officials, all aimed at winning approval for extending his stay in the United States and, ultimately, for the purpose of obtaining United States citizenship. In 1999, in one of his final acts in this regard, Biheiri submitted an Application for Naturalization to the INS on which he falsely stated (i) that he had not been absent from the United States since becoming a lawful permanent resident, and (ii) that he had not knowingly committed any crimes for which he had not been arrested. In fact, Biheiri had been absent from the United States at least sixteen times during the relevant time period, and had made several material false statements at earlier stages of the immigration process. Although Biheiri's request for naturalization was granted, his conduct in the course of obtaining American citizenship ultimately resulted in his first conviction and sentence and the loss of that citizenship.

During approximately the 1990–2000 period, Biheiri worked as an investment banker specializing in real estate investment opportunities for observant Muslims, whose religion forbids the charging or pay-

ing of interest. In this capacity, he established and operated BMI, Inc., a New Jersey-based holding company that directly, and through various subsidiary entities, invested in the development of housing projects. Unfortunately for Biheiri and his investors, BMI's ventures proved generally unprofitable, and the company filed for bankruptcy in the late 1990's.

Prior to BMI's demise, one of Biheiri's principal investors and business associates was Mousa Abu Marzook. As previously stated, the government placed Marzook on its list of Specially Designated Terrorists ("SDTs") in 1995, thereby making it illegal to deal in property in which he possessed an interest. Records from BMI and its related entities reflect that Biheiri invested substantial amounts of money for Marzook both before and after Marzook's designation as an SDT. Particularly pertinent in this regard are the records of Mostan International Corporation ("Mostan"), a New Jersey company that Biheiri incorporated in August 1988. While Mostan's incorporation papers indicate that it shared a business address with BMI, and that Biheiri was its registered agent and a director, Mostan's bank and tax records also reflect that Marzook was Mostan's president and its one hundred percent shareholder. Bank records further indicate that Mostan's BMI-managed account was quite active, recording at least fifty-six significant monetary transactions between 1991 and 1996, thirteen of which occurred after Marzook's 1995 SDT designation. Mostan's own records reflect that as late as 1996, Mostan was receiving distributions from BMI construction projects and checks drawn on the accounts of BMI entities.[9] In sum, the records of BMI and

---

8. The facts recited here are derived from a substantial record including trial testimony and exhibits, as well as additional testimony and documentary evidence adduced in the course of the sentencing hearings.

9. Although BMI's real estate ventures were not ultimately successful, it does not necessarily follow that Marzook did not receive a return on his investment.

Mostan indicate that Marzook was an active investor in Biheiri's real estate ventures from 1988 until 1996.

At some point, the business relationship between BMI and Mostan came to the attention of several federal agencies. Government reports and other documents indicate that the U.S. Customs Service—a predecessor agency to Immigration and Customs Enforcement ("ICE"), one of the agencies whose investigation led to Biheiri's two prosecutions—was aware as early as 1991 that Marzook was investing in Maryland real estate ventures through BMI. The FBI also took an interest in BMI during the 1990's, and certain of its internal reports similarly reflect an awareness of the financial relationship between Biheiri, BMI, Mostan, and Marzook. Biheiri, in fact, received a subpoena from the FBI's Chicago field office in 1997 requesting records for Kadi International Corporation, a BMI subsidiary. The same FBI office later subpoenaed the Bank of New York for Mostan's financial records, and consequently received an account signature card for Mostan listing Marzook and Biheiri as its president and vice-president, respectively. This record evidence makes unmistakably clear that the FBI and an ICE predecessor agency had documentary evidence of the financial relationship between Biheiri and Marzook as long ago as 1991.

At or around the time of BMI's bankruptcy in the late 1990's, Biheiri moved with his family from New Jersey to Sterling, Virginia, where he continued to work in investment banking. In the summer of 2002, Biheiri left his family in Virginia and went to work overseas, eventually gaining employment with a Swiss bank with inter-

ests in both Switzerland and Egypt. During the same period, Biheiri's activities as president of the now-defunct BMI came to the attention of a multi-agency federal task force investigating terrorist financing in Northern Virginia. Special Agents David Kane of ICE and Mary Balberchak of the Internal Revenue Service ("IRS") played leading roles in this investigation, traveling to Chicago in late 2002 to meet with an FBI agent involved in an investigation of HAMAS. Agent Balberchak's notes from her meeting with the FBI agent reflect that the agent told her that Mostan was a BMI subsidiary located in Secaucus, New Jersey, and that both Marzook and Biheiri were associated with Mostan. Agents Kane and Balberchak also interviewed Biheiri's wife at the family's home in Sterling in May 2003, and were told by her, among other things, that Biheiri and Marzook were well acquainted.

On June 15, 2003, after approximately one year's absence from the United States, Biheiri returned to the United States by flying from Zurich, Switzerland to Dulles Airport in Loudoun County, Virginia. Upon deplaning, he was met in the terminal's International Arrivals Area by ICE agents who asked him whether he would consent to be interviewed. Biheiri agreed and was then led to a conference room near the customs area where Agents Kane and Balberchak interviewed him for approximately four and one-half hours. During the course of the interview, the agents asked Biheiri about his business activities and associates, specifically inquiring whether he had any personal or business dealings with Marzook. According to the agents, Biheiri denied such dealings, stating that he had never handled money or conducted transactions on behalf of Marzook or HAMAS.[10] At the conclusion of

---

10. Whether Biheiri made these statements to the agents was sharply disputed at trial, with Biheiri denying emphatically that he did and noting that he had no reason to conceal his relationship with Marzook. The agents, by contrast, were equally emphatic that they recalled that the false statements were made, claiming that Biheiri had every reason to conceal his terrorist ties. The jury ultimately accepted the agents' testimony.

the interview, Biheiri was arrested, and has since remained in federal custody.

In late June 2003, following the Dulles interview and Biheiri's arrest, Agent Kane again traveled to Chicago to meet with FBI agents and review records. On this occasion, he reviewed Mostan's business records and discovered documents linking Biheiri and Marzook. Other federal agents, meanwhile, examined files taken from Biheiri's laptop computer and evidence seized during the search of the residence of Ismail Elbarasse in August 2003.[11] As a result of these post-interview efforts, federal agents uncovered, among other things, (i) federal tax returns for Mostan identifying Marzook as its sole shareholder; (ii) bank records for Mostan showing large wire transfers to overseas accounts; (iii) written correspondence discussing Mostan funds invested in BMI projects; and (iv) an agreement executed by Biheiri and Marzook whereby Marzook agreed to be a representative of BMI tasked to find new investors, for which service he was to be paid a ten percent commission on the profits from new funds brought in.

Given these record facts, the next task is to determine the Guidelines sentencing range applicable to Biheiri and then to consider this range together with the other § 3553 sentencing factors.

## III.

Under the Sentencing Guidelines, a defendant's sentencing range is determined formulaically by his criminal history category and the offense level assigned to the criminal activity for which he is being sentenced. *See* U.S.S.G. § 1B1.1(g) (2004). More specifically, § 1B1.1, entitled "Application Instructions," sets forth the following steps for determining a defendant's Guidelines range:

(i) First, determine the base offense level applicable to each offense of conviction.

(ii) Next, for each offense of conviction, apply any appropriate adjustments based on the defendant's victim, role in the offense, or obstruction of justice.

(iii) Then, group the various counts and determine the counts' combined offense level.

(iv) If appropriate, apply a downward adjustment for acceptance of responsibility.

(v) Finally, using the defendant's criminal history category, determine the defendant's sentencing range and whether a departure from that range is appropriate under the circumstances.

*See* U.S.S.G. §§ 1B1.1(a)-(i) (2004). This process was followed here.

### 1. Base Offense Levels

The parties correctly agreed that Appendix A of the Guidelines Manual specifies U.S.S.G. §§ 2B1.1(a) and 2L2.2(a) as the base Guidelines for violations of 18 U.S.C. § 1001(a) as alleged in Count 1 and § 1546(a) as alleged in Count 3. From this it follows, as the parties also agreed, that the base offense level for Count 1 (false statements) is six, and the base offense level for Count 3 (passport fraud) is eight.

### 2. Base Offense Level Adjustments

Next, the government argued for two adjustments to the Count 1 base offense level: (i) an enhancement pursuant to U.S.S.G. § 3A1.4, Application Note 2, on the theory that Biheiri's false statements regarding Marzook "involved, or were intended to promote" terrorism by obstructing Agents Kane and Balberchak's "inves-

---

**11.** Elbarasse, long believed by federal law enforcement agencies to be a HAMAS operative, was arrested in August 2004 after being ob-

served videotaping the Chesapeake Bay Bridge from a vehicle.

tigation of a federal crime of terrorism"; and (ii) an obstruction-of-justice adjustment pursuant to U.S.S.G. § 3C1.1 on the theory that Biheiri committed perjury at trial regarding his compliance with an FBI subpoena. Biheiri sharply disputed the applicability of both provisions.

## A. § 3A1.4

■ U.S.S.G. § 3A1.4 provides for a sentencing enhancement for any felony "that involved, or was intended to promote, a federal crime of terrorism." Application Note 2, the portion of the Guideline at issue here, clarifies that "obstructing an investigation of a federal crime of terrorism" shall be considered within § 3A1.4's scope. Thus, under § 3A1.4, a defendant is deemed to "promote" a federal crime of terrorism, and hence to deserve the provision's sentencing enhancement, when that defendant engages in conduct that obstructs a federal terrorism investigation. And significantly, the effect of § 3A1.4 is potentially draconian; it provides for an increase in a defendant's criminal history category to Category VI, and for a minimum final offense level of thirty-two.[12] In this case, therefore, the application of the enhancement would result in a Sentencing Guidelines range well in excess of the five year statutory maximum sentence applicable to violations of § 1001(a), and also well beyond the applicable Sentencing Guidelines range in the absence of the enhancement.[13]

Here, the government argued that § 3A1.4 applied because Biheiri obstructed Agents Kane and Balberchak's terrorist-financing investigation by lying about his relationship with Marzook. As an initial matter, the parties disputed whether § 3A1.4 requires a showing of actual obstruction or merely the attempt to obstruct. The parties then further disputed whether the government had carried its burden of proving factually that such an obstruction occurred.

■ Although the Guidelines provide no examples of "obstructing" conduct within the meaning of Application Note 2, and neither party adduced authority addressing this question, the plain language of § 3A1.4 makes clear that actual obstruction is required. Unlike other obstruction-of-justice provisions in the Sentencing Guidelines and the United States Code, § 3A1.4 makes no mention of attempt to obstruct. For example, U.S.S.G. § 3C1.1, the general obstruction-of-justice Sentencing Guideline, provides for a comparatively modest two-level enhancement for any defendant who "willfully obstructed or impeded, *or attempted to obstruct or impede,* the administration of justice ...." *See* U.S.S.G. § 3C1.1 (emphasis added). The Sentencing Commission's deliberate inclusion of "attempt to obstruct" in § 3C1.1 makes clear that the absence of analogous language in § 3A1.4 is not accidental; because § 3A1.4 omits attempts, it follows that the provision, as its plain language indicates, covers only actual obstructions, not mere attempts. This conclusion finds further support in a comparison of § 3A1.4 to 18 U.S.C. § 1503, the federal obstruction-of-justice statute, which punishes a defendant who "*corruptly ... endeavors* to influence, intimidate, or impede" the administration of justice. 18 U.S.C. § 1503(a) (2004) (emphasis added). Contrary to the government's contention, the fact that attempts to obstruct justice are punished under both § 3C1.1 and § 1503

---

12. Section 3A1.4 provides for offense-level increases beyond level thirty-two when a defendant's base offense level is twenty-one or higher, in which case it results in a twelve-level increase. *See* U.S.S.G. § 3A1.4(a).

13. It is thus easy to see that the parties' dispute over the applicability of § 3A1.4 was central to the imposition of an appropriate sentence for Biheiri.

does not imply that attempts should also be punished under § 3A1.4. Instead, because both § 3C1.1 and § 1503 expressly include attempts, while § 3A1.4 does not, the more reasonable inference is that attempts were intentionally omitted from § 3A1.4. Moreover, it is worth noting that where, as here, obstruction of justice takes the form of false statements to a law enforcement officer, § 3C1.1 does not cover the mere attempt to obstruct.[14] This is yet additional support for the conclusion that § 3A1.4 applies only where the conduct in issue actually obstructs an investigation of a federal crime of terrorism.[15]

Given that § 3A1.4 applies only to actual obstructions, the question is then whether the government showed by a preponderance of the evidence that Biheiri's false statements actually obstructed an investigation of a federal crime of terrorism. To carry its burden, the government contended that Agents Kane and Balberchak were unaware of the financial relationship between Biheiri and Marzook, and that had Biheiri told the truth about his dealings with Marzook, the government would have made additional inquiries of Biheiri and thus "learned sooner about Marzook's infu-

sion of money into BMI through Mostan, . . . a determination that would have been significant in the government's investigation of fundraising for HAMAS." Govt.'s Mem. at 8, 11. To support this argument, the government cited *United States v. Maflahi,* No. 03–CR–412 (E.D.N.Y. July 9, 2004), which involved, as here, the application of § 3A1.4 to a defendant convicted of making false statements under 18 U.S.C. § 1001(a). In *Maflahi,* the district court stated that it was "appropriate under the Guidelines to enhance [the defendant's offense level] . . . under § 3A1.4" because "the defendant knew he was lying about facts relevant to an investigation of a federal crime of terrorism." [16]

The present case, however, is easily distinguished from *Maflahi* because the agents who interviewed Biheiri had actual knowledge that Biheiri's statement regarding his relationship with Marzook was false. The record here convincingly reflects that several months prior to the Dulles Airport interview, the investigating agents were informed of a relationship between Mostan, BMI, Marzook and Biheiri by an agent in the FBI's Chicago field office. The record further reflects that

---

**14.** Among the examples of conduct set forth in § 3C1.1 is "providing a materially false statement to a law enforcement officer that *significantly obstructed* or impeded the official investigation." *See* U.S.S.G. 3C1.1, Application Note 4(g) (emphasis added). The deliberate use "significantly obstructed" in the example suggests, by negative implication, that the mere attempt to obstruct is insufficient for an enhancement where false statements are concerned. *See United States v. Francis,* 39 F.3d 803, 812 (7th Cir.1994) (holding actual obstruction required for a § 3C1.1 enhancement on a false statement conviction).

**15.** Because § 3A1.4's plain language unambiguously refers only to "obstructing" conduct and omits any reference to attempts at such conduct, Biheiri's rule of lenity argument does not apply. *See United States v. Lund,* 853 F.2d 242, 245 (4th Cir.1988) (rule

of lenity inapplicable absent statutory ambiguity). But assuming *arguendo* that § 3A1.4 were deemed ambiguous in this respect, then, to be sure, the rule of lenity would apply as it is now settled that Sentencing Guidelines factors are essentially elements of the crime, *see Apprendi v. New Jersey,* 530 U.S. 466, 494 n. 19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which should be construed in Biheiri's favor when ambiguous. Accordingly, were § 3A1.4 deemed ambiguous as to its coverage of attempts to obstruct, then the rule of lenity would support Biheiri's reading of the provision.

**16.** Ultimately, the district court in *Maflahi* did not apply § 3A1.4 due to Sixth Amendment concerns under *Blakely,* and thus its statement regarding the application of § 3A1.4 to a defendant convicted of making false statements is *dictum.*

the FBI and ICE—though not necessarily the particular agents involved—were aware of this relationship for several years prior to the interview. The agents investigating Biheiri were hindered by his false statements, if at all, only because at the time of the 2003 Dulles Airport interview, they had simply forgotten what they had learned earlier in their investigation.[17] Under such circumstances, the government cannot claim that its reliance on Biheiri's false statements was reasonable, and thus Biheiri's false statements caused no actual obstruction of their terrorism financing investigation.

For the foregoing reasons, a § 3A1.4 sentencing enhancement for obstructing a federal crime of terrorism investigation is inapplicable here.

## B. § 3C1.1

 U.S.S.G. § 3C1.1 provides for a two-level enhancement of a defendant's base offense level where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice ...." Here, the government contended that Biheiri obstructed or attempted to obstruct justice by falsely testifying at trial that, in response to FBI subpoenas, he supplied the government with documents reflecting the BMI—Mostan relationship. It is well-settled that perjury at trial may be the basis for a § 3C1.1 enhancement. *See United States v. Dunnigan*, 507 U.S. 87, 94–95, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). For § 3C1.1 to apply here, the government had to prove that Biheiri (i) gave false testimony under oath; (ii) concerning a material

matter; (iii) with the willful intent to deceive. *See United States v. Hammoud*, 381 F.3d 316, 357 (4th Cir.2004).

Although the record does show that Biheiri and other BMI employees did not send documents regarding Mostan to the government in response to the 1997 subpoena, it does not necessarily follow from this that Biheiri willfully testified falsely on this point. On direct examination, Biheiri stated that he had sent documents to the FBI "for every single corporation we ever ... established, for every limited partnership, for every bank statement of any bank account we ever opened in Bank of New York." The point was never narrowed, however, to the specific question of Mostan-related documents, and it is unclear whether Biheiri, in making this statement, was referring only to BMI subsidiaries and other entities in which he owned an interest, but not to client-owned entities like Mostan. Moreover, the scope of the FBI's document request and the passage of time since Biheiri complied with the request suggest that to the extent that Biheiri's statement about having sent documents "for every corporation" was factually inaccurate, it is equally probable that the inaccuracy may have resulted from confusion, mistake, or the absence of recollection, rather than from the deliberate intent to deceive.

In sum, the government did not carry its burden of showing the perjury required for the adjustment pursuant to § 3C1.1, and accordingly, no base offense level adjustments are appropriate here. The offense levels for Counts 1 and 3 remain six and eight, respectively.[18]

---

**17.** Given this, it is unnecessary to reach or decide the interesting question whether knowledge by another investigating agency or team could be attributed to agents Kane and Balberchak to lead to the same result.

**18.** It should be noted that the question whether Biheiri committed perjury at trial is ulti-

mately irrelevant, as the imposition of a two-level § 3C1.1 enhancement would not change his Guidelines sentencing range. This is so because the enhancement would apply only to Count 1, raising the offense level for that count from six to eight. Because Count 3's offense level is also eight, such an increase

### 3. Grouping and Combined Offense Level

■ Under U.S.S.G. § 3D1.2, multiple counts of conviction may be "grouped" when they are "closely related," *i.e.*, when they "involv[e] substantially the same harm." U.S.S.G. § 3D1.2. Grouping results in multiple counts being treated as a single count for sentencing purposes and is thus desirable from a defendant's standpoint.[19] *See* U.S.S.G. § 3D1.3. Here, while it was undisputed that Biheiri's false statement and passport fraud offenses were not "closely related" within the meaning of § 3D1.2, Biheiri contended nonetheless that his passport fraud offense involved "substantially the same harm" as, and thus should be grouped with, the naturalization fraud offenses for which he was sentenced in the first prosecution. In short, Biheiri contended that the false statement count should have been the sole sentencing consideration under the Guidelines.

■ This argument is mistaken. Although § 3D1.2 states that "all counts involving substantially the same harm shall be grouped together into a single Group," it does not allow or even mention the possibility of grouping counts across multiple prosecutions. Not surprisingly, Biheiri cited no authority holding that such grouping is permissible and none was found. But, even assuming that cross-prosecution grouping were permitted, it is doubtful that it would apply here because it is not clear that Biheiri's passport fraud and naturalization fraud offenses involved "substantially the same harm." Section 3D1.2 sets forth several factors bearing on this issue, including whether the offenses involve (i) the same victim, (ii) the same act or transaction, or (iii) a common scheme or plan. *See* U.S.S.G. § 3D1.2. Here, the victim of Biheiri's fraudulent naturalization application was the Immigration and Naturalization Service while the victim of his passport fraud was the U.S. Department of State. The offenses, moreover, were committed through separate acts, as Biheiri applied for a passport in September 2000, more than one and one-half years after submitting his fraudulent naturalization application. Finally, there is no evidence that Biheiri's naturalization fraud and passport fraud offenses were part of a common scheme or plan. *Cf. United States v. Pitts*, 176 F.3d 239, 244 (4th Cir.1999) (overlap in time significant to "common scheme" determination). Accordingly, Biheiri's passport fraud offense may not be grouped under § 3D1.2 with his naturalization fraud offenses. As a result, a two-point upward adjustment for multiple counts was appropriately applied to the higher of Biheiri's base offense levels, resulting in a combined offense level of ten for both counts. *See* §§ U.S.S.G. 3D1.3—3D1.4.

### 4. Acceptance of Responsibility

■ U.S.S.G. § 3E1.1 provides for a two-level reduction in offense level "if the defendant clearly demonstrates acceptance of responsibility for his offense." Here, Biheiri contended that he should receive a downward adjustment pursuant to § 3E1.1 because he pled guilty to Count 3 of the superseding indictment.

■ It is settled law that a defendant has the burden of establishing his entitlement to a § 3E1.1 reduction, and that the

---

would not raise Biheiri's final offense level. *See* U.S.S.G. § 3D1.4.

**19.** The introductory commentary to Chapter 3, Part D of the Guidelines explains that the practice of treating closely-related counts as a single count is designed "to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct." *See* U.S.S.G. Ch. 3, Pt. D, 334 (2004).

reduction does not automatically follow from the entry of a guilty plea. *See United States v. Nale,* 101 F.3d 1000, 1005 (4th Cir.1996); *United States v. Harris,* 882 F.2d 902, 905–06 (4th Cir.1989). Commentary for § 3E1.1 states that in determining whether a defendant qualifies for the reduction, a court may consider "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility," and courts have held that timeliness "depends on the facts of the individual case." *United States v. Lancaster,* 112 F.3d 156, 158 (4th Cir.1997).

In this case, Biheiri's acceptance of responsibility regarding the passport fraud charge was not timely. He entered his guilty plea on the day that his trial began, following the denial of several of his motions that, if granted, would have disposed of the case. *See United States v. Small,* 35 F.3d 557, 1994 WL 502011 (4th Cir. 1994) (unpublished) (guilty plea not timely when entered "on the eve of trial"); *United States v. Brack,* 188 F.3d 748, 764 (7th Cir.1999) (upholding district court's denial of § 3E1.1 adjustment where defendant did not plead guilty until four days before trial). By the time Biheiri's plea was entered, the government had already invested significant resources in the prosecution of his case. More importantly, however, Biheiri's decision to plead guilty to passport fraud was purely a tactical decision designed to prevent the government from introducing evidence of other deceptive conduct in order to improve his chances for acquittal on the false statement count. Accordingly, Biheiri is not entitled to a § 3E1.1 acceptance of responsibility adjustment, and his offense level remains at ten.

## 5. Guidelines Sentencing Range and Departures

■ Appropriately, the parties did not dispute that Biheiri should be in criminal history category II as a result of his twelve-month sentence for naturalization fraud. *See* U.S.S.G. § 4A1.1, Ch. 5, Pt. A, 375 (2004). Given a final offense level of ten and a criminal history category of II, Biheiri's Guidelines sentencing range is eight to fourteen months incarceration.

The government contended that a departure from this range was appropriate here because Biheiri's false statements regarding Marzook were committed with the intent to conceal his involvement in illegal terrorist financing. *See supra* note 1. In support of this argument, the government cited U.S.S.G. § 5K2.9, which provides that "[i]f the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct."

This argument fails because it ignores the broader Guidelines rule that upward departures will not be applied except in circumstances where "there exists an aggravating or mitigating circumstance ... of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines ...." U.S.S.G. § 5K2.0. Application Note 2 to § 3A1.4 makes clear that the Commission had adequately considered the circumstances of this case. The fact that the § 3A1.4 enhancement was ultimately found not to apply in this case is hardly evidence that the Sentencing Commission did not adequately consider whether Biheiri's conduct should receive punishment beyond that normally meted out to false-statement offenders. To the contrary, the existence of § 3A1.4 is ample evidence that the Commission considered precisely these circumstances, but chose not to extend the deservedly draconian penalty for terrorism-related conduct in the precise circumstances of Biheiri's case. Put differently, § 3A1.4 reflects that the Commission ade-

quately considered and decided that § 3A1.4 should apply, and Biheiri should receive a five year sentence for the false statement conviction, only if it were shown that he actually obstructed the federal terrorism financing investigation.

In sum, the argument that Biheiri's case falls outside the range of circumstances adequately considered by the Commission in formulating the Guidelines plainly fails, and Biheiri's sentencing range under the Guidelines remains eight to fourteen months.[20]

### IV.

As noted in Part I, § 3553 provides a list of goals for district judges to consider when imposing sentence, including (i) promoting respect for the law, (ii) providing just punishment for the offense given the seriousness, (iii) affording adequate deterrence to criminal conduct, (iv) protecting the public, and (v) providing the defendant with reasonable rehabilitative opportunities. Here, a thirteen month sentence is sufficient, but not greater than necessary to meet these objectives. Because Biheiri will be deported to Egypt immediately following his release from confinement, the goals of protecting the public and providing rehabilitative opportunities are of little import in the instant circumstances. And, while it may appear that a longer sentence is appropriate given Biheiri's involvement in terrorist financing, the principle that a defendant should only be punished for the offenses of conviction as provided by law

commands that this involvement should not drive the sentence.[21] Finally, the fact that a thirteen month sentence is within the Guidelines range provides assurance that Biheiri's sentence will not be markedly different from other sentences imposed in similar circumstances.

For the foregoing reasons, Biheiri was sentenced to a term of imprisonment of thirteen months and one day, with credit for time already served for the instant offenses. The applicable criminal fine is waived in light of the fine previously imposed on Biheiri as a result of his earlier conviction for naturalization fraud [22] and his current inability to pay a further fine. He is subject to a special assessment fee of $200, and is required to cooperate with ICE to effect his prompt removal from the United States upon his release from prison.

An appropriate judgment and conviction order has issued.

---

**20.** Biheiri also argues that recent decisions have held § 5K2.9 inapplicable to false statement counts under 18 U.S.C. § 1001(a) as a general rule. As the Eighth Circuit put it in *United States v. Robertson*, 324 F.3d 1028 (8th Cir.2003), "the possibility that a suspect would lie to an interrogator in order to minimize his exposure to criminal prosecution most certainly would have been within [the Sentencing Commission's] consideration. We do not believe that a case in which the defendant knowingly lies to a federal agent regard-

ing a fact material to the agent's investigation falls outside the heartland of such offenses merely because the defendant told the lie to conceal aspects of the offense for which he was arrested." *Id.* at 1032.

**21.** To conclude otherwise in this case would effectively render § 3A1.4 meaningless.

**22.** Biheiri received a $15,000 fine at his naturalization fraud sentencing. *See Biheiri I*, 299 F.Supp.2d at 612.